UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DONNA S. JUTE,
        Plaintiff       :
                   :      CIVIL ACTION NO.
                   :      3:01CV123(AVC)
v.                  :
                   :
HAMILTON SUNDSTRAND
CORPORATION,         :
        Defendant    :      December 8, 2003

### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARYJUDGMENT

Plaintiff submits this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment dated September 22, 2003. Plaintiff further relies on the attached Affidavits.

## I. PROCEDURAL HISTORY

Plaintiff filed this claim in two counts alleging violation of Title VII of the Civil Rights Act of 1964(Title VII), 42 U.S.C. §2000e et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-60(a)(4). Plaintiff alleges that the defendant retaliated against her for opposing a discriminatory employment practice and assisting in a proceeding under Title VII and CFEPA. Defendant now files a motion for summary judgment.

## II. PRELIMINARY STATEMENT

Plaintiff was laid off in January, 2000, because she was a Labor Grade 7 and all Labor Grade 7s were laid off. However, plaintiff would have been a Labor Grade 5 but

for defendant's retaliation.  Plaintiff was an exceptional employee as indicated by her performance reviews. Plaintiff's peers at the company, that is, employees who began employment at or about the time that plaintiff did, were no longer Labor Grade 7s, having been promoted prior to January, 2000.  Plaintiff's claim is that because she complained of sexual harassment beginning in 1990, resulting in the resignation of her supervisor, and then in 1994 assisted another employee by volunteering to be a witness for that employee against the company in a Title VII action (plaintiff provided written statements at the employee's request and was later named as a witness in the employee's lawsuit), she was labeled a troublemaker by management.  In 1998, within one day after plaintiff was named as a witness in the Brunton lawsuit, defendant began anew taking adverse actions against plaintiff in retaliation for her protected activities under Title VII.  Despite plaintiff's superior performance, her right to a promotion in accordance with the union contract and attendant JET (joint enrichment technology) agreements, and representations made to plaintiff by management that she would be promoted, she was denied a promotion to a Labor Grade 5 on first shift, as well as a salaried position.   Had defendant not retaliated against plaintiff by blocking her promotions, she would not have been a Labor Grade 7 in January, 2000.

Following her layoff, plaintiff was treated differently than other laid off employees in that her name was not included on a list of potential employees for International Fuel

Cells ("IFC"). The fact that plaintiff's name was not on the list can be reasonably inferred from the evidence, including the fact that defendant's were unable to produce the list, despite verifying that such a list existed in January, 2000. Finally, when plaintiff managed to get an interview and a job offer from IFC on her own later in 2000, defendant once again retaliated by interfering in the hiring process, advising IFC that plaintiff had a "lawsuit" against the company, and causing IFC to withdraw their offer of employment to plaintiff.

## III.    FACTS

Plaintiff was hired by defendant on August 14, 1986 as a Customer Material Attendant. She was an hourly employee and the terms of her employment were governed by a Collective Bargaining Agreement between the defendant and the International Association of Machinists and Aerospace Workers, AFL-CIO Lodge 743 (the Union), of which she was a member. During her employment Ms. Jute worked in various positions, and at the time of her layoff in January, 2000 she was a Repair Technician III, Labor Grade 7 in Environmental Control Systems, (ECS), Dept. 607. Plaintiff was one of a number of employees laid off on January 11, 2000. All laid off employees were Labor Grade 7s.

In 1990, plaintiff filed an internal complaint of sexual harassment against her former supervisor, John Gamache, who then resigned from the company. (Statement of

3

Undisputed Facts, 26(f) Report).  Following his resignation, plaintiff experienced

harassment by management, which continued for years (Exh. 1, Jute Dep. I at 97-104,

Exh. 3, Jute Dep. III at 20-21).  In June, 1994, Maryann Brunton, a coworker, came to

plaintiff and asked that she give a statement to defendant's internal security

department. (Jute Dep. I at 41-42, III at 75) Ms. Brunton, who was running for office

with the Union, was allegedly harassed by employees through disparaging flyers being

left around the building in which Ms. Brunton worked.  The flyers contained statements

about Ms. Brunton that were sexually offensive to her.  Ms. Jute had witnessed the

flyers being left in the restroom.  Jute agreed to give a statement to internal security

stating what she had seen.  When that statement disappeared, plaintiff created another

statement at Ms. Brunton's request to go to United Technologies, the parent company

of defendant, so that action could be taken against the individual allegedly harassing

Ms. Brunton. (Id.; Exh. 4)

Ms. Brunton later brought a federal lawsuit against Hamilton Sundstrand and the

Union under Title VII alleging hostile environment and gender harassment based on the

distribution of flyers by the co-worker.  On July 9, 1998, Ms. Brunton was deposed in

her lawsuit and named Donna Jute as the witness who had seen the individual

distributing the flyers. (Def. Exh. G, Jute dep. I at 87-88).  The statements also became

part of the record in that case.(Exh. 4)

Beginning in June 1997, plaintiff was assigned to the JDE (J.D.Edwards software) implementation team.  JDE is an enterprise resource planning tool.  It is used to manage Hamilton Sundstrand's operating units from finance to purchasing to sales order to inventory. (Exh. 5, Reinauer dep. at 6; Statement of Undisputed Facts, 26(f) Report ). The team was created to set up and train for the upgrade to the new software system throughout Hamilton Sundstrand.   Plaintiff was the only hourly worker assigned to this team. (Exh. 2, Jute depo. II at 44)  As a member of the team, she acquired valuable knowledge that would have enhanced her career opportunities at Hamilton. (Exh. 5, Reinhauer dep. at 8, Exh. 20, Delgado dep. at 19) On June 15, 1998, plaintiff was told by Natonia Crowe-Hagans, ("TC"), the Director of Operations for the East Windsor plant of Hamilton Sundstrand, where plaintiff was employed, that in 90 days, that is, on September 15, 1998, she would be given a promotion to Labor Grade 5 for her work on the JDE team. (Jute depo., II, 30, 60-63, Affidavits of MacLean and Ducas)

On July 10, 1998, one day after Ms. Brunton named plaintiff as a witness in her lawsuit, Ms. Jute was abruptly pulled off the JDE team by Ms. Crowe Hagans, two weeks before a crucial date when the system would be operational. (Exh. 5, Reinhauer dep. at 10)  Ms. Crowe Hagans appeared to be angry with plaintiff and ordered her back out on the shop floor and off the team. (Jute dep.I at 77, II at 31-32, 52-53)  Glen Reinhauer, plaintiff's supervisor on the JDE team(Exh. 5, Reinhauer dep. at 7, Jute

5

dep. I at 220), emerged from his office and asked Ms. Crowe Hagans incredulously "why are you taking her away two weeks before we're going live?" (Id; III at 61-62) Ms. Crowe Hagans replied "I want her back out on the floor". (Id) Plaintiff was the only person pulled off the team. (Jute dep. II at 33-35)

Soon after being pulled off the team, at the end of July 1998, the Information Systems/Technology ("IS" or "IT") department expressed an interest in having plaintiff work for them as a salaried employee.  Management in that department had seen Ms. Jute "in action" and was impressed with her work on the JDE team. They were looking for a way to get plaintiff back after she was pulled off the JDE team.  Kirby Strole, manager of IS, went to Ms. Crowe Hagans to inquire about having Ms. Jute join the department as a salaried employee.  Mr. Strole then came back to Ms. Jute and said he could not hire her because she did not "have a degree". (Jute dep. I at 43, II at 44-45, 94-97) Others in the department, for example, Peter Mulkern, who was a salaried employee in the IT department did not have a degree. (Id; Exh. 6, e-mail from Peter Mulkern).

In August, 1998, plaintiff was to start giving aerobics classes at Hamilton Sundstrand in the evenings for which she would be paid $25.00.  The classes were run by Ray Wallcraft Park, a recreation area owned by Hamilton Sundstrand. (Jute dep. II at 47-51).  In anticipation of giving these classes, Hamilton paid for plaintiff to take a CPR

6

class in April, 1998. (Id.)  Plaintiff had been dealing with a woman named Shelly from the Park.  On or about July 15, 1998, plaintiff got a call from a man who did not identify himself other than to say he was calling on behalf of Shelly to advise her that her services as an aerobics instructor would not be needed.(Id.)

In September, 1998, plaintiff did not receive her Labor Grade 5 as Ms. Crowe Hagans had promised on June 15, 1998.  On the advice of her union steward, Mark Hebert, who confirmed that Ms. Jute would not be getting her Labor Grade 5 for doing JDE, plaintiff then filed a grievance so that she could be trained to receiver her Labor Grade 5 so that she could keep her job. (Exh. 7, grievance; Jute dep. at 27-29) Others with less seniority were being trained and promoted, which formed the basis of the grievance. (Id).  During the same time period, all hourly employees were offered the opportunity to train to qualify for a promotion.  At that time, the offer of promotion for plaintiff was on second shift. (Def. Exh. K; Exh. 8, "Accepted Jet Training documents and Seniority List) Although others were either promoted or offered to train to be promoted on first shift, plaintiff was the "cut off point". (Jute dep. II at 66-68, Exh. 8) That is, plaintiff and everyone less senior than her would have to go to second shift to get the promotion. Plaintiff began her training in November, 1998. (Jute dep. II at 26-27).

In December, 1998, plaintiff had a conversation with Maryann Brunton's

7

husband. He told plaintiff that Maryann's case had settled. Plaintiff then called Ms.

Brunton and learned that Brunton had been deposed on July 9, and August 26, 1998.

Plaintiff now realized for the first time why she had suddenly been pulled from the team,

not gotten the salaried position, been told that she could not teach aerobics, was not

promoted to a Labor Grade 5 for being on JDE, and was the cutoff point for promotions

on second shift. (Jute dep. I at 92-96; II at 79) Plaintiff went to Ingrid Delgado and told

her that she now realized that her involvement in the Brunton lawsuit which had been

settled was negatively affecting Jute's employment. (Jute dep. I at 91-96) In response,

Ms. Delgado said "face it, your harassment's never going to stop. Go find another job."

(Id.)

　　Plaintiff then became concerned that she would be put on second shift

immediately, prior to completing her training. She was advised by Tony Walters, union

steward, that this was to happen. (Jute II at 79-81) Because plaintiff had a daughter at

home and a husband that traveled, plaintiff knew she could not go on second shift until

at least September, 2000, when her daughter would be old enough to occasionally stay

alone. Plaintiff then rescinded her acceptance of the opportunity to train to qualify for a

promotion on second shift. (Def. Exh. L)

　　Plaintiff made it clear that she was not refusing the promotion, and wanted to

continue to train and be promoted, but could not go on second shift at that time. She

8

confirmed this in writing by giving a statement to Tony Walters. (Jute dep. II at 79)

Plaintiff was allowed to continue to train and completed her training in August or September, 1999. (Jute dep. II at 83.)  She was "deemed qualified" and obtained her "inspection stamp". (Statement of Undisputed Facts, 26(f)Report; Jute dep. II at 82).  In accordance with the JET agreement, this should have qualified plaintiff for a promotion to Labor Grade 5 (Def. Exh.J, 3(e),).  The difference between a Labor Grade 5 and 7 is the ability to accept or reject work. (Exh. 9, job descriptions) In fact, Brad Dahlquist, told plaintiff in April, 1999, that when she received her stamp, she would get her promotion to Labor Grade 5. (Jute depo.I, at 60, II at 81-82, 84, 90;  Affid. of R. MacLean).  The CBA would not have prohibited plaintiff's promotion on first shift.  At least one other union member was granted a hardship for personal reasons (Jute dep. II at 69), there was a position on days for a Labor Grade 5 because plaintiff was doing it (Jute dep. II at 83-84), and there was no one more senior than Jute on days who would have to be promoted first because Jute was the cutoff, that is, all those more senior who had completed training were already promoted (Exh. 8).  Furthermore, immediately following the layoff in January, 2000, James Foley, who was less senior than Jute, was brought on days as a Labor Grade 5.  Thus, there was a position for a Labor Grade 5 on days at the time of plaintiff's layoff and Mr. Foley was placed in that position. (Jute I at 69, 83)

In September, 1999, Glenn Reinhauer asked plaintiff "what did you do to piss

9

T.C off.  Why does she have such a hard on for you?" (Jute dep. III at 23, 60; Affid. of
R. MacLean).  Mr. Reinhauer had been attempting to get plaintiff to travel with the JDE
team to remote locations such as Long Beach and Maastricht, despite the fact that she
was no longer on the team, and plaintiff was not being permitted to go. (Jute dep. III at
23, 60).

In December, 1999, plaintiff spent one day training for a salaried position working
for Byron Yost. (Jute dep. I at 44, II at 98-103) Plaintiff was told by Mr. Yost that she
would have the salaried position being vacated by Dawn Modeen so that she could
avoid the layoff that was coming. (Jute dep. I at 44, 198; II at 98-103; Affid. of L.Ducas)
After plaintiff trained for the position with Dawn Modeen and Todd Alimberti, and after
she was told what her salary would be by Mr. Yost, she came to work to begin her new
job and was told by Mr. Yost that Ms. Crowe Hagans "said no". (Id) Kathy Michaud, a
salaried employee from outside the department, was put in the position. (Jute depo. I at
208).  Just prior to the layoff, Steve Schwart and William Kelly, hourly employee who
had less seniority than plaintiff were given salaried jobs. (Exh. 10).

On January 11, 2000, plaintiff was laid off. Following the layoff, Hamilton
Sundstrand compiled a list of people that International Fuel Cells ("IFC") could consider
for employment.(Exh. 11)  Plaintiff's name was not included on that list, despite her skill
set and outstanding performance while at Hamilton.  Plaintiff was considered by

10

management to be an "excellent employee" (Jute dep. II at 115-116, 132-133; Exh. 12,

performance reviews; Exh. 20 Delgado dep. at 32 ) Others who were part of the layoff,

with less experience than Jute, were offered jobs by IFC, including Linda Ducas and

Michael Fiaschetti, plaintiff's brother. (Id; Affid. of L.Ducas).

In November, 2000, plaintiff interviewed and was offered a job at IFC by Russell

Hubley. Lisa Zarzicki, an acquaintance of plaintiff's who used to work at Hamilton

recommended Jute to Mr. Hubley. Following an interview, Mr. Hubley telephoned Ms.

Jute at home and offered her the job. Plaintiff husband, Richard Jute, witnessed the

phone call. (Exh. 13, R. Jute depo. at 15-17.) Jute told her husband, Renee MacLean,

Linda Ducas, and Lisa Zarzicki that Russ had offered her the job. (Exh. 14, Zarzicki

depo. at 12; Affid. of MacLean and Ducas) She was given a start date and salary and

was told that she needed to come in and fill out an application so that personnel would

have her information, which she did. (Exh. 15) Thereafter, plaintiff was told by Lisa

Zarzicki that the job had been offered to Terry Poley. (Zarzicki depo. at 21-22, Exh.16,

e-mails) When plaintiff called Mr. Hubley, he told her that he had been "stopped at

personnel" in regards to hiring her. When plaintiff explained that she had a lawsuit

against the company, Mr. Hubley stated "that sums up what I heard." (Jute depo. I at

47-48, 162-174, 188-197, II at 107-113, III at 29-33) Byron Yost admitted telling Mr.

Hubley when he called for a reference that Ms. Jute "had a lawsuit against the

11

company." (Exh. 17, Yost depo. at 19-20)  In fact, at that time, plaintiff had filed an administrative complaint with the CHRO and EEOC and there was no lawsuit pending.

Following the rescinded job offer, plaintiff's counsel wrote a letter putting Hamilton on notice that plaintiff was denied a job because of a pending administrative claim against Hamilton, that "blacklisting" was prohibited by Connecticut law, and that plaintiff was interested in negotiating a job at IFC for a release of claims.(Exh. 18)

The actions taken against plaintiff after July, 1998 through her layoff in January, 2000, originated with Ms. Crowe Hagans. (Jute depo. I at 212-213, II at 42, 102, 106.) The layoff was the "final act" of retaliation during plaintiff's employment. (Jute dep. I at 72). Ms. Crowe Hagans interfaced with Tom Cryer, Director of Labor Relations, on "numerous occasions." (Exh. 19, Crowe Hagan's dep. at 10) Ingrid Delgado, Manager of Human Resources for Support Groups, learned of plaintiff's participation in the Brunton matter from Tom Cryer, or someone in his group. (Exh. 20, Delgado depo. at 35).

## IV.    LEGAL ARGUMENT

### A.    Summary Judgment Standard

A motion for summary judgment may not be granted unless the court determines that there are no genuine issues of material fact to be tried and that the facts as to which there is no issue warrant judgment for the moving party as a matter of law. Quinn

v. Green Tree Credit Corp., 159 F.3d 759, 764-65 (2d Cir. 1998). "If there is *any* evidence in the record from which a reasonable inference can be drawn in favor of the nonmoving party on a material issue of fact, summary judgment is improper." Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505,2510-11(1986)(emphasis added). The court must review all of the evidence in the record drawing all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence. Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097 (2000)(citations omitted).

"In employment discrimination cases, where liability often turns on the issue of intent, courts should approach a motion for summary judgment with special caution." See Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994). "Because employers rarely leave direct evidence of discriminatory intent, the court must scrutinize all of the available evidence in search of circumstantial proof to rebut the employer's explanation for its actions." See Hollander v. American Cyanamid Co.. 895 F.2d 80, 85 (2d Cir. 1990).

When applying the *McDonnell Douglas* burden-shifting analysis in ruling on a motion for summary judgment in a Title VII case, the court must remain cognizant that

> employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates

is unlikely to leave a 'smoking gun', such as a notation in an employee's personnel file, attesting to a discriminatory intent. A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence. Consequently, in a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate.

Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991).

## B.    Elements of Prima Facie Case

Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §2000e-3(a).

### 1. Retaliation

In order to establish a prima facie case of retaliation under Title VII, plaintiff must show by a preponderance of the evidence (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001); See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802.

As to the third element, plaintiff need only show that a retaliatory motive played a part in the adverse employment action, whether or not it was the sole cause, and even if valid objective reasons for the discharge exist. Sumner v. U.S. Postal Service, 899

14

F.2d 203, 208-209 (2d Cir. 1990; Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769

(2d Cir. 1998); Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998); Reed v. A.W.

Lawrence & Co., 95 F.3d 1170 (2d Cir. 1996).

As will be further discussed below, plaintiff has adduced sufficient evidence from

which a jury could find in plaintiff's favor as to each of the elements of her claim.

### 2. Failure to Promote

In order to establish a prima facie claim of failure to promote, the plaintiff must

allege that: 1) she is a member of a protected class; 2) her job performance was

satisfactory; 3)she applied for and was denied promotion to a position for which she

was qualified; and 4) the position remained open and the employer continued to seek

applicants. Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998).

There is no dispute that plaintiff's job performance was excellent as evidenced

by her performance reviews, her performance on the JDE team, and the opinion of

members of management.  When asked what kind of performer plaintiff was, Ingrid

Delgado, Manager of Human Resources replied, "she was an excellent employee".  It is

also undisputed that plaintiff sought training for and sought a promotion to Labor Grade

5 in order to save her job.  Finally, there is evidence that other employees with less

seniority were treated differently than Ms. Jute and were placed in Labor Grade 5

positions on first shift at the time of the layoff (James Foley) or were given salaried jobs

15

(Steven Schwart and William Kelly), which plaintiff had also sought in order to avoid the layoff. Whether or not plaintiff was in the protected class will be discussed below.

### 3. Connecticut Fair Employment Practices Act ("CFEPA")

Conn. Gen. Stat. 46a-60(4) prohibits discrimination against any person "because he has opposed any discriminatory employment practice or because he has... assisted in any proceeding" under CFEPA. Claims of discrimination under CFEPA are analyzed under the same McDonnell-Douglas burden shifting analysis applicable to claims under Title VII. Levy v. Commission on Human Rights and Opportunities, 236 Conn. 96, 103 (1996).

### 4. Deminimis Burden

The plaintiff's burden at this stage is not onerous. Chambers v. TRM Copy Centers Corp., 43 F.3d 289, 37 (2d Cir. 1994). In determining whether the plaintiff has met the deminimis initial burden, the function of this Court on a summary judgment motion is to determine whether the proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a discriminatory motive. See Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir. 1987).

### C. Burden Shifting and Pretext

Once plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, clear, specific and nondiscriminatory reason for

16

discharging the employee.  See <u>Gallo</u>, 22 F.3d at 1226.  If the defendant satisfies this burden, the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for discrimination.

For summary judgment purposes, unless an employer has come forward with evidence of a dispositive nondiscriminatory reason for the discharge as to which there is no genuine issue and which no rational trier of fact could reject, any conflict between the employee's evidence establishing the prima facie case and the employer's evidence of a non-discriminatory reason reflects a question of fact to be resolved by the fact-finder. <u>Cronin v. Aetna Life Ins. Co.</u>, 46 F.3d 196, 293(2d Cir. 1995).

The factfinder's disbelief of the reasons put forward by the defendant, together with the elements of the <u>prima facie</u> case, may suffice to show intentional discrimination.  This is because rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

<u>Reeves</u>, 530 U.S. 133, 136 (2000)(citations omitted).  See also <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 511 (1993).

As stated above, plaintiff can establish her retaliation claim by showing that the

reduction in force was not the only reason for her discharge and that her engaging in protected activity made a difference. Montana, 859 F.2d at 105 citing Hagelthorn v. Kennecott Corp. 710 F.2d 76, 82 (2d Cir. 1983). Even if the workforce reduction is legitimate, a claim that the employer has subjected the plaintiff to discrimination as an individual does not require the plaintiff to prove that the reorganization as a whole was pretextual. "In such circumstances, a plaintiff defending a motion for summary judgment need demonstrate only that a genuine issue exists as to whether, despite the employer's ostensible rationale and overall operations, intentional discrimination is the persuasive explanation for the plaintiff's treatment." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204(2d Cir. 1995). Title VII allows a cause of action against business decisions that merge with discrimination. See Montana v. First Federal Savings and Loan, 869 F.2d 100 (2d Cir. 1989) (summary judgment reversed where in structural reorganization case, plaintiff put forth sufficient evidence that discharge occurred under circumstances giving rise to an inference of discrimination, including failure to offer plaintiff alternative available positions); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985)(courts must refrain from second guessing decision making processes, but must allow employees to show that employer acted in an illegitimate or arbitrary manner); Maresco v. Evans Chemetics , 964 F.2d 106 (2d Cir. 1992)(summary judgment reversed where alleged reorganization resulted in consolidation of operations rather

18

than an elimination of plaintiff's position) ; Graefenhain v. Pabst Brewing Co., 827 F.2d

13, 21 n.8 (7th Cir. 1987) (ADEA creates cause of action against business decisions that

merge with age discrimination).

 A court may find evidence of discrimination where, as here, an employer locates

new positions for employees who are not members of a protected class and fails to do

the same for employees who are members of a protected class.  See Vaughn v. Mobil

Oil Corp., 708 F.Supp. 595, 600-01 (S.D.N.Y. 1989) (an inference of age discrimination

may arise when employer locates new positions for younger, but not older, workers in

implementing a reorganization.); Oxman v. WLS-TV, 846 F.2d 448, 454 (7th Cir. 1988);

Poklitar v. CBS, Inc., 652 F.Supp. at 1027; Deutsch v. Carl Zeiss, Inc., 529 F.Supp. 215

(S.D.N.Y. 1981);Cronin v. Aetna Life Ins. Co., 46 F.3d 196(2d Cir. 1995).

 In this case, there are numerous genuine issues of material fact in dispute as to

whether defendant's stated reasons for adverse actions disadvantaging plaintiff were

pretextual, and, thus, whether her opposition to and participation in a Title VII

proceeding was a factor in plaintiff's termination.  For example, plaintiff asserts direct

evidence of discrimination through the statements of Ingrid Delgado, who, in response

to plaintiff's statement of the connection between her being named as a witness and the

adverse actions plaintiff had endured from July 1998 through December 1998 stated

that plaintiff's harassment will never stop and she should get another job.  This, plaintiff

asserts, was an admission of defendant's retaliatory animus.  Plaintiff also relies on the

temporal proximity, that is, one day, between notice to defendant of protected activity

and adverse employment action taken when plaintiff was pulled off the JDE team.

Although defendant contends that all members of the team were pulled, plaintiff

disputes this fact, and suggests that defendant's explanation for pulling plaintiff from the

team, two weeks before they were going live, makes no sense and a jury would not be

required to believe it.  Plaintiff further asserts that in accordance with the CBA and JET

agreements that she should have received her Labor Grade 5 upon getting her

inspection stamp and that there is no explanation, pretextual or otherwise, for the

company's failure to promote plaintiff in August or September, 1999.  Finally, there is

sufficient evidence that others not in the protected class were treated differently,

namely James Foley, Steve Schwart, William Kelly, and other employees who got their

Labor Grade 5s on days without having to switch shifts.  With respect to the acts of

defendant following her layoff that impacted her ability to find employment, the

testimony of plaintiff and defendant, as well as third party witnesses, is contradictory.

As these are material issues of fact in dispute, they are issues of credibility for the jury

to determine.

Contrary to defendant's assertions, its stated legitimate business reason for

plaintiff's termination, a financially mandated restructuring, does not definitively refute

plaintiff's prima facie case or her argument of pretext. The cumulative impact of the issues in dispute as set forth by plaintiff permits an inference of retaliation, and thus plaintiff has established a triable issue of fact in response to defendant's proffered explanation.

**D.    Plaintiff Engaged in Protected Activity**

Plaintiff engaged in protected activity in 1990 when she made a complaint against her supervisor for sexual harassment, in 1994 when she provided statements regarding a co-workers claim of hostile environment and gender discrimination, when she was identified by the coworker as a witness in a lawsuit filed by the coworker in 1998. (It is undisputed that plaintiff's 1994 statements became part of the record in that lawsuit), and when she filed an administrative claim in May, 2000.

Title VII's anti-retaliation provision is broadly drawn. As court's have consistently recognized, the explicit language of §704(a)'s participation clause is expansive and seemingly contains no limitations. Deravin v. Kerik and NYC Dept. of Corrections, 335 F.3d 195, 203-204 (2d Cir. 2003) As the Supreme Court has noted, "read naturally, the word 'any' has an expansive meaning," and thus, so long as "Congress did not add any language limiting the breadth of that word," the term "any" must be given literal effect. United States v. Gonzales, 520 U.S. 1, 5 (1997).

Plaintiff provided statements in response to  Ms. Brunton's request and allowed

21

those statements to be used in later litigation. Hamilton knew, therefore, that plaintiff was a witness for the plaintiff in that case. This is exactly the kind of "participation" and "assistance" that Title VII's anti-retaliation provision is designed to protect. Clearly, plaintiff has satisfied this element of her claim. Furthermore, plaintiff's opposition to sexual harassment in 1990 would also bring her under the umbrella of protection provided by Title VII. Opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection. Cruz v. Coach Stores, 202 F.3d 560, 566 (2d Cir. 2000).

## E.    Protected Activities Were Known to Defendant

Defendant was aware of plaintiff's protected activities. Although Ms. Crowe-Hagan claims that she was unaware of plaintiff's involvement in the Brunton matter, the jury is not required to believe her. See Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir.)(while the decision-maker denies making the retaliatory statement, this is an issue of credibility for the jury.) Moreover, all that is necessary to prove that the employer was aware of plaintiff's participation in protected activity is general corporate knowledge. Gordon v. NYC Bd. of Ed., 232 F.3d 111 (2d Cir. 2000)(a jury can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, so long as the jury finds that ... an agent is acting explicitly or implicitly upon the orders of a superior who has the requisite knowlege); Alston v. NYC Trans. Auth., 14 F.Supp.

22

2d 308, 311 (S.D.N.Y. 1998)(in order to satisfy the second prong of her retaliation claim, plaintiff need not show that individual decision-makers knew that she had filed a complaint).

In this case, it is undisputed that Hamilton Sundstrand management in the Human Resources Department, including Ingrid Delgado and Thomas Cryer, were aware of plaintiff's protected activities. Ms. Delgado even told plaintiff that the harassment would never stop and she should find a new job. Ms. Crowe Hagans interfaced with Mr. Cryer often. There is sufficient evidence from which a jury could infer knowledge of Jute's protected activity.

F.    **Plaintiff Suffered Adverse Employment Actions**

Plaintiff is claiming that she experienced numerous adverse employment actions at the hands of the defendant that kept her from being promoted to a Labor Grade 5 or a salaried position and left her vulnerable to a layoff.

Adverse employment actions are materially adverse changes in the terms, privileges, duration, and condition of employment. Treglia at 720. Adverse actions are considered material if they are of such quality *or quantity* that a reasonable employee would find the conditions of her employment altered for the worse. Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997)(emphasis added). Adverse employment actions are not limited to "pecuniary emoluments." Preda v. Nissho Iwai Am. Corp., 128 F.3d 789,

23

791 (2d Cir. 1997). Claims of discriminatory failure to promote fall within the core activities encompassed by the term "adverse actions". Morris v. Landau, 196 F.3d 102, 110 (2d Cir. 1999). Adverse employment actions include demotions. Id.  The Second Circuit has also found adverse employment action even after an employee has been terminated where the employer takes some additional step which adversely affects the employee's ability to secure future employment.  Silver v. Mohasco Corp, 602 F.2d 1083, 1090 (2d Cir. 1979), rev'd on other grounds, 447 U.S. 807 (1980).

In this case, plaintiff alleges the following adverse employment actions occurred after she engaged in protected activity:

- Pulled off the JDE team (July, 1998)
- Denied salaried position in IT/IS Department (July, 1998);
- Opportunity to be aerobics instructor for pay cancelled (July, 1998);
- Did not receive Labor Grade 5 for doing JDE as promised (Sept. 1998);
- Plaintiff was cutoff point, so did not get Labor Grade 5 on first shift (Sept. 1998);
-Did not get promoted to Labor Grade 5 despite obtaining her Inspection Stamp (August, 1999);
- Not permitted to travel with JDE team at request of Reinhauer (Sept. 1999)
- Denied salaried position working for Byron Yost (Dec. 1999)
- Terminated on January 11, 2000
- Not included on list of potential rehires given to IFC (Jan., 2000)
- Defendant provided false information to IFC - including that plaintiff had a "lawsuit" against the company - preventing plaintiff's hire.(Nov. 2000)

It should also be noted that telling a "sister company" (both defendant and IFC were owned by United Technologies Corporation) that a potential applicant has a

24

"lawsuit" against the former employer is an adverse employment action, despite

defendant's statement to the contrary. See Defendant's Memorandum FN 16.

Weissman v. Dawn Joy Fashions, 214 F.3d 224, 234 (2d Cir. 2000)(an employer who

fails to rehire an otherwise qualified former employee who has brought litigation against

the employer may be guilty of retaliation if that litigation is a reason for not hiring the

employee). Here, plaintiff alleges that the "negative job reference" containing false

information (that is, that plaintiff had a lawsuit against the company, which was not true

at the time the statement was made because plaintiff had only filed an administrative

claim at that time) was the reason that IFC did not hire the plaintiff. Disclosing

information about a former employee's opposition to an unlawful employment practice

or providing false information about a former employee is actionable conduct. Veprinsky

v. Fluor Daniel, Inc., 87 F.3d 881, 894-95 (7th Cir. 1996) (reversing the district court

because a genuine issue of material fact existed on former employee's claim of

retaliation in providing inaccurate information to his new employer and disclosing

pending EEOC charge).

    Likewise the dissemination of adverse employment references can constitute a

violation of Title VII if motivated by discriminatory intent. See Wanamaker v. Columbian

Rope Co., 108 F.3d 462, 466 (2d Cir. 1997); Silver v. Mohasco Corp., 602 F.2d 1083,

1090 (2d Cir. 1979) (blacklisting employee violates Title VII).

The quantity and quality of the adverse actions taken against plaintiff are sufficient to satisfy this element of her claim.

**G.    Plaintiff's Claims are not Time Barred**

Plaintiff's claims based on these adverse employment actions are not time barred as defendant suggests. Defendant's Memorandum, FN 14. The retaliation against the plaintiff was "continuous" from the date she was removed from the JDE team in July, 1998 through her layoff in January, 2000. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765-66 (2d Cir. 1998). The continuing-violation exception "extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts standing alone, would have been barred by the statute of limitations." Annis v. County of Westchester, 136 F.3d 239, 246 (2d Cir. 1998). A continuing violation may be found "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir. 1994). In this case, beginning in July, 1998, and continuing until her layoff and beyond, each time an opportunity arose for plaintiff to be disadvantaged by defendant in the terms and conditions of her employment or in her prospects for future employment, defendant acted to the detriment of plaintiff.

26

Assuming, *arguendo,* that the adverse employment actions do not fall within the continuing violations exception, any adverse employment actions occurring after July 23, 1999 (300 days before plaintiff filed her CHRO complaint on May 18, 2000), including failure to promote to Labor Grade 5 once plaintiff got her inspection stamp in August or September, 1999, and being denied a salaried position just prior to the layoff, would be actionable, in addition to the layoff, failure to include on list of potential rehires, and the claim of providing false information to IFC.

Clearly, plaintiff has alleged sufficient evidence of adverse employment actions that constitute continuing violations, or which fall within the applicable limitations period, such that they are timely and not barred.

**H.     Causal Connection**

Plaintiff has also met the causal connection requirement in establishing a prima facie case of retaliation. "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence retaliatory animus." Mandell v. The County of Suffolk and Gallagher, 316 F.3d 368 (2d Cir. 2003).

In this case, plaintiff's protected activities preceded the alleged adverse employment actions. Given the limited burden a plaintiff must meet to establish a prima facie case, this alone is sufficient to demonstrate a causal connection. See Raniola v.

27

Bratton, 243 F.3d 610, 624 (2d Cir. 2001) (explaining that the plaintiff's burden in establishing a prima facie case is a "light one usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement").

In this case, plaintiff claims that she was pulled off the JDE team *one day* after being named as a witness in the Brunton lawsuit. It is well settled that proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action. Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) ; Davis v. State Univ. of N.Y., 802 F.2d 638, 642 (2d Cir. 1986).

In Mandell v. County of Suffolk, 316 F.3d 368 (2d Cir. 2003) a police officer alleged, among other things, that his employer failed to promote him in retaliation for public criticism of the police department. The Second Circuit found that the officer submitted adequate proof to support a finding that his public criticism of the police department affected the decision-maker's promotion and transfer decisions. The defendant argued that the substantial time lapse (five years) between the plaintiff's speech and the adverse employment actions precluded a finding of causation. Although it is true that to provide an independent basis for an inference of causation, temporal proximity must be significantly greater (that is, the time lapse must be shorter), in Mandell, the plaintiff relied instead on direct evidence of retaliatory animus, namely

28

comments by management that suggested that plaintiff's public criticism of the department "may have had a lasting effect on plaintiff's career." Therefore, the court found that the time lapse, although lengthy, did not conclusively establish lack of causation. The court stated "It makes logical sense that if an employer wishes to retaliate by firing an employee, he is likely to do so soon after the event. In a failure to promote case, however, the opportunities for retaliation do not necessarily immediately present themselves." 316 F.3d at 384.

Likewise, here, plaintiff's initial protected activity occurred in 1990, ten years before her layoff. However, it was the kind of activity that plaintiff alleges had a "lasting effect on her career" at Hamilton because her complaint resulted in a foreman being forced to resign. Although plaintiff fought through the poor treatment she received following this incident, when asked to help Maryann Brunton in 1994, she could not say no because she knew how Ms. Brunton felt. This protected act, which continued through the litigation of Ms. Brunton's action in 1998, renewed the retaliation upon plaintiff and the affect on her career. Because plaintiff asserts direct evidence of retaliatory animus as well as temporal proximity, the lapse in time between her initial protected activities and the ultimate adverse employment action - her layoff - should not be fatal to her claim.

29

I.      **Plaintiff has Exhausted Remedies as to all Claims**

Defendant suggests that plaintiff's claim that defendant interfered with her ability to get a job at IFC, specifically by advising Russ Hubley and IFC's personnel department that she had a "lawsuit against the company", resulting in rescinding of a job offer, is barred because plaintiff did not file a CHRO or EEOC claim as to this specific charge.  Retaliation claims arising after the administrative complaint has been filed have been deemed reasonably related to the original EEOC filing for purposes of exhaustion of remedies.  <u>Owens vs. NYC Housing Authority</u>, 934 F.2d 405, 410-11(2d Cir. 1991); <u>Malarkey v. Texaco, Inc.</u>, 983 F.2d 1204,1208 (2d Cir. 1993).

In addition, defendant cannot claim that it was unaware of plaintiff's claims as defendant received a letter from plaintiff's counsel putting it on notice that plaintiff had been denied a job because of her pending claim, and offering to negotiate a release of plaintiff's claim in exchange for employment at IFC.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Defendant's

Motion for Summary Judgment be denied.

PLAINTIFF, DONNA JUTE

Barbara E. Gardner
Attorney at Law
843 Main Street
Suite 1-4
Manchester, CT 06040
Fed. Bar No. Ct07623
(860) 643-5543
Bg@bgardnerlaw.com

31

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed, postage prepaid, on this 8th  day of December, 2003, to the following counsel of record:

Daniel A. Schwartz
Day, Berry & Howard, LLP
CityPlace
Hartford, CT 06103-3499


Barbara E. Gardner

32