UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONNA S. JUTE, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:01CV123(AVC) |
| v. | : | |
| | : | |
| HAMILTON SUNDSTRAND | : | |
| CORPORATION, | : | |
| Defendant. | : | NOVEMBER 24, 2003 |

### DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT

1. Hamilton Sundstrand hired Donna Jute in August 1986 as a Customer Material Attendant. During her employment, she worked in various positions, including Material Attendant, Operating Technician and, finally Repair Technician III. At all times, Jute was an hourly employee and the terms of her employment were covered by a Collective Bargaining Agreement ("CBA") between the Company and the International Association of Machinists and Aerospace Workers, AFL-CIO Lodge 743 (the "Union"). (CBA, attached as Ex. B; Deposition of Donna Jute, Day I ("Jute Dep. I") at 64, attached as Ex. D.)

2. The CBA dictated how promotions were to be made and required those decisions to "be made on the basis of the most senior qualified employee within the job ladder." (CBA at 25, Ex. B.)

3. In June 1994, numerous individuals were campaigning for positions on the Union's executive board. During the course of the campaign, Maryann Brunton, an hourly employee who was a candidate for one of the positions, suggested to the Company that disparaging statements were being made about her on flyers left in the building in which Jute worked. (Summary of

41460439_1.DOC
November 24, 2003 12:54 PM

company investigation, Ex. C.) In response, the Company immediately initiated an internal investigation. (Id.)

4. During the course of the investigation, <u>and at the Company's request</u>, Jute provided two sworn statements stating that she had witnessed a female co-worker leave flyers about Brunton in a Company ladies' restroom. (Delgado Aff. at 6, Ex. A; Jute Dep. III at 43, Ex. F.)

5. Jute did not file a complaint; rather, the Company contacted Jute and asked her to provide a statement as part of the Company's investigation. (Jute Dep. II at 5-6, Ex. E.)

6. In 1995, Brunton initiated a federal court action in the District of Connecticut alleging that the Company and Union engaged in gender discrimination arising out of the Union campaign. <u>Brunton v. Hamilton Standard</u>, Civil Action No. 3:95CV02581 (JBA). The Company denied the allegations in the lawsuit.

7. During the entire course of the litigation, Jute never filed any affidavits referring to this matter, nor was her deposition taken. (Jute Dep. III at 41, Ex. F.)

8. Indeed, the only connection Jute had with that case was a passing reference in the deposition of Brunton that Jute had provided a statement to the Company in its investigation. (Deposition excerpt of Maryann Brunton at 142-43, 441, Ex. G.)

9. Jute herself had no involvement whatsoever in the litigation of that matter. (Jute Dep. III, 40-42, Ex. F.)

10. Natonia "T.C." Crowe-Hagans served as Director of Operations for the Company's East Windsor Repair and Overhaul area and oversaw Jute's area from 1997 (when Crowe-Hagans

was hired) to 2000. (Deposition of Natonia Crowe-Hagans ("Crowe-Hagans Dep.") at 6-7, 11, Ex. H.)

11. Crowe-Hagans -- who Jute contends was the sole person responsible for "retaliating" against her (Jute Dep. I at 37, Ex. D) and who was the decision-maker in this case -- was never aware that Jute had filed statements relating to the Company's 1994 investigation, or that Jute's name was mentioned during the deposition of Maryann Brunton. (Id. at 11.)

12. Even at the time of Jute's eventual layoff in 2000, Crowe-Hagans remained unaware of such matters and did not even know about Maryann Brunton. (Id. at 11, 13.) Indeed, she only became aware of such claims through Jute's filing of this Complaint. (Id.)

13. Jute admitted that she had no first-hand knowledge that Crowe-Hagans was aware of the 1994 statements and that it was just an "assumption" on her part. (Jute Dep. I at 78, Ex. D.)

14. In 1995 --after Jute provided the statements that she claims form the basis of her lawsuit-- Hamilton Sundstrand actually promoted Jute to a Labor Grade 7. (Jute Dep. I at 136-37, Ex. D.)

15. From that time until her layoff in early 2000, she continued to hold a Labor Grade 7 position on the preferred (or first) shift. (Id.)

16. In September 1998, Hamilton Sundstrand and the Union agreed to a program where offers would be made to Labor Grade 7 employees to train for a promotion to a Labor Grade 5 position. (Affidavit of Brad Dahlquist ("Dahlquist Aff.") ¶4, attached as Ex. I; 9/1/98 Letter of Agreement, attached as Ex. J.) When the employee was deemed qualified as a result of this

training, the Company and Union agreed that the employee would be promoted to a Labor Grade 5, Repair Technician II position. (Id.)

17. Consistent with the limited window of this agreement, the Company offered Jute the opportunity to train in a new area. (Dahlquist Aff. at 4, Ex. I.)

18. Jute would thus have been promoted from a Repair Technician III, Labor Grade 7 position on 1st shift to a Repair Technician II, Labor Grade 5 on 2nd shift, when she was deemed qualified. (Id.; Jute Dep. I at 42, Ex. D.)

19. As with promotion decisions, shift determinations are controlled by the CBA. (CBA at 25, Ex. B; Jute Dep. I at 65, Ex. D.)

20. Jute accepted the offer for training and promotion on September 23, 1998. (Mem. from Donna Jute dated Sept. 23, 1998, Ex. K.)

21. On December 14, 1998, Jute revoked her acceptance of the training and promotion to a Repair Technician II, Labor Grade 5 position. (Dahlquist Aff. ¶6, Ex. I; Memo from Donna Jute dated Dec. 14, 1998, Ex. L.)

22. Jute did not want to accept the promotion because it would have required her to work on the second shift and Jute had concerns about who would take care of her daughter. (Jute Dep. I at 71-72, Ex. D.)

23. Because Jute had already begun training in new tasks, the Company continued training her in the area of inspection. (Dahlquist Aff. ¶7, Ex. I.)

24. Jute completed the training in April or May 1999. (Dahlquist Aff. ¶7, Ex. I.)

25. Because Jute had already revoked her acceptance of the promotion and because of the nature and time frame of the agreement between the Union and the Company, Jute was not promoted to a Labor Grade 5 position. (Deposition of Brad Dahlquist ("Dahlquist Dep.") at 23-24, Ex. M.)

26. In late 1999, Hamilton Sundstrand began to reorganize as a result of a merger. (Sept. 21, 1999 Company announcement, Ex. N.) In accordance with the Company-wide effort to achieve increased competitiveness in the aerospace industry, the East Windsor Overhaul and Repair facility where Jute worked planned to reduce the facility's headcount. (Id.)

27. Hamilton Sundstrand terminated approximately twenty employees who were all Labor Grade 7, including Jute, effective January 24, 2000. (List of those affected by Reduction in Force, Ex. O.)

28. In the area where Jute was working, the Company terminated the employment of all Labor Grade 7 employees. (Id.; Crowe-Hagans Dep. at 35, Ex. H.)

29. The Company determined that elimination of this lower labor grade would best serve customers because the Company would still have Labor Grade 5 employees available with greater skills to perform some of those same tasks. (Id.)

30. Jute acknowledged that the cause of her layoff was her refusal to accept a promotion working on second shift:

>     Q: If you had taken a position eventually, a labor grade five second shift, do you know whether or not the company would have laid you off?
>     A: *I believe I wouldn't have gotten laid off.*

> Q: Okay. And why not? Why wouldn't you have been laid off?
> A: *Because I wouldn't have been a labor grade seven.*

(Jute Dep. I at 74, Ex. D.)

31. Jute's experience was consistent with others who were Labor Grade 7; those who turned down the opportunity to train for a promotion were also laid off. (Jute Dep. I at 116, Ex. D.) Indeed, Jute's brother was also a Labor Grade 7 at Hamilton Sundstrand; he too turned down the same opportunity for a promotion to Labor Grade 5 and was terminated in the same reduction in force as the Plaintiff. (Jute Dep. I at 115-16, Ex. D.)

32. On or about May 18, 2000, Jute brought a claim of retaliation under Conn. Gen. Stat. § 46a-60(a) (4) to the Connecticut Commission on Human Rights and Opportunities ("CHRO") and cross-filed the claim on Title VII grounds with the Equal Employment Opportunity Commission ("EEOC") in early June 2000 (the "Charge") (attached as Ex. P.)

33. In the Charge, she alleged that she was denied a promotion to Labor Grade 5 and that her employment was terminated, because she opposed a discriminatory employment practice and assisted in a discriminatory employment practice. (Id.)

34. In November 2000, Jute applied for and interviewed for a possible position at International Fuel Cells (now called UTC Power), a separate corporate entity from Hamilton Sundstrand. (Deposition of Russell Hubley ("Hubley Dep.") at 10, Ex. Q.)

35. The UTC Power manager responsible for the decision, Russell Hubley, decided not to hire anyone for the position for budgetary reasons; instead, the duties were assigned to existing employees. (Hubley Dep. at 17, 25, Ex. Q.)

36. Jute admitted at her deposition that although she suspected one person at Hamilton Sundstrand, Tom Cryer, gave her a negative reference, she had no personal knowledge of whether he did or not. (Jute Dep. III at 47, Ex. F.)

37. A former supervisor of the Plaintiff's, Byron Yost, was contacted by Hubley as a reference; however, Yost declined to comment in light of Plaintiff's pending CHRO charge. (Hubley Dep. at 12, Ex. Q; Deposition of Byron Yost ("Yost Dep.") at 20, Ex. S.)

DEFENDANT,
HAMILTON SUNDSTRAND
CORPORATION,

_____
Felix J. Springer (ct #05700)
Daniel A. Schwartz (ct#15823)
Day, Berry & Howard LLP
CityPlace
Hartford, CT 06103-3499
(860) 275-0100
fax: (860) 275-0343
email: daschwartz@dbh.com

### CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing, has been sent via electronic mail and first class mail, postage prepaid, this date to:

Barbara E. Gardner, Esq.
843 Main Street, Suite 1-4
Manchester, CT  06040

_____
Daniel A. Schwartz